UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

LISA E.,[1]

            Plaintiff,

    v.

COMMISSIONER, SOCIAL SECURITY
ADMINISTRATION,

            Defendant.

Case No. 6:20-CV-00719-YY

OPINION AND ORDER

YOU, Magistrate Judge.

      Plaintiff Lisa E. seeks judicial review of the final decision by the Commissioner of the

Social Security Administration ("Commissioner") denying her application for Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433.  This

court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

For the reasons set forth below, that decision is REVERSED and REMANDED for further

proceedings consistent with this opinion.

## BACKGROUND

      Plaintiff protectively filed for DIB on September 20, 2016, alleging disability beginning

on September 4, 2012.  Plaintiff's application was initially denied on March 7, 2017, and upon

---

[1] In the interest of privacy, the court uses only plaintiff's first name and the first initial of
plaintiff's last name.

reconsideration on July 13, 2017. Plaintiff requested a hearing before an Administrative Law

Judge ("ALJ"), which took place by video on April 23, 2019. Plaintiff and a vocational expert

testified at the hearing. At the hearing, plaintiff amended her alleged onset date to November 21,

2013. Tr. 13. On May 7, 2019, the ALJ issued a decision, finding plaintiff not disabled within

the meaning of the Act.

The Appeals Council denied plaintiff's request for review on March 3, 2020. Tr. 1-3.

Therefore, the ALJ's decision is the Commissioner's final decision and subject to review by this

court. 20 C.F.R. § 416.1481.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper

legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C.

§ 405(g); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). This court must weigh the

evidence that supports and detracts from the ALJ's conclusion and "'may not affirm simply by

isolating a specific quantum of supporting evidence.'" *Garrison v. Colvin*, 759 F.3d 995, 1009-

10 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)). This

court may not substitute its judgment for that of the Commissioner when the evidence can

reasonably support either affirming or reversing the decision. *Parra v. Astrue*, 481 F.3d 742, 746

(9th Cir. 2007). Instead, where the evidence is susceptible to more than one rational

interpretation, the Commissioner's decision must be upheld if it is "supported by inferences

reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008)

(citation omitted); *see also Lingenfelter*, 504 F.3d at 1035.

## SEQUENTIAL ANALYSIS AND ALJ FINDINGS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. § 416.920; *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006) (discussing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)). The claimant bears the burden of proof at steps one through four. *Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001). The Commissioner bears the burden of proof at step five. *Id.* at 953-54.

At step one, the ALJ found plaintiff had not engaged in substantial gainful activity from her amended onset date of November 21, 2013, through her date last insured of December 31, 2017. Tr. 15. At step two, the ALJ determined that plaintiff had the following severe impairments: "surgical repair; mild left shoulder osteoarthritis; chronic pain syndrome; migraines; and depression, when considered in combination with her physical issues and pain (20 CFR 404.1520(c))." Tr. 15.

At step three, the ALJ found that "[t]hrough the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)." Tr. 17. The ALJ next assessed plaintiff's residual functional capacity ("RFC") and determined:

> [T]he claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant could lift and carry 20 pounds occasionally and 10 pounds frequently with the dominant right upper extremity. The left upper extremity could only be used to assist the right upper extremity.

She could stand and/or walk for approximately 6 hours and sit for approximately 6 hours, in an 8-hour workday, with normal breaks. The claimant could not climb ladders, ropes and scaffold and only occasionally climb stairs and ramps. The claimant could frequently stoop, kneel and crouch, but could not crawl. She could not reach overhead with the left upper extremity. The claimant could understand, remember and carry out simple and routine instructions that can be learned in 30 days or less. The claimant could perform only low stress work, which is defined as requiring only occasional changes in work setting, occasional changes in work duties, and no work on a conveyor belt. The claimant could have no exposure to moving mechanical parts and high, unprotected place hazards, as rated by the Dictionary of Occupational Titles (DOT). She could not perform a job that required driving or use of a computer.

Tr. 19.

At step four, the ALJ found that plaintiff was unable to perform any past relevant work. At step five, the ALJ found that, considering plaintiff's age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that she could perform, including inserting machine operator, collator operator, and photocopy machine operator.  Tr. 23-24.  Thus, the ALJ concluded plaintiff was not disabled.  *Id.*

## DISCUSSION

Plaintiff contends the ALJ failed to identify specific, clear and convincing reasons supported by substantial evidence in the record to discredit her subjective symptom testimony.

## I.    Relevant Law Regarding Assessing a Claimant's Testimony

When a claimant has medically documented impairments that could reasonably be expected to produce some degree of the symptoms complained of, and the record contains no affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of . . . symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996) (citation omitted).  A general assertion that the claimant is not credible is insufficient; the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible."  *Dodrill v. Shalala*, 12

F.3d 915, 918 (9th Cir. 1993).  The proffered reasons must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (internal citation omitted).

If the "ALJ's credibility finding is supported by substantial evidence in the record, [the court] may not engage in second-guessing."  *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (citation omitted).  "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (citation omitted).  "Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."  *Id.*

Effective March 28, 2016, the Commissioner superseded Social Security Ruling ("SSR") 96-7p, governing the assessment of a claimant's "credibility," and replaced it with SSR 16-3p. *See* SSR 16-3p, *available at* 2016 WL 1119029.  SSR 16-3p eliminates the reference to "credibility," clarifies that "subjective symptom evaluation is not an examination of an individual's character," and requires the ALJ to consider all the evidence in an individual's record when evaluating the intensity and persistence of symptoms.  *Id.* at *1-2.  The ALJ must examine "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record."  *Id.* at *4.  SSR 16-3p explains that "[w]hen a Federal court reviews our final decision in a claim, we expect the court will review the final decision using the rules that were in effect at the time we issued the decision under review."

The decision under review is dated May 7, 2019.  Tr. 25.  Therefore, SSR 16-3p applies.

## II.    Analysis

The ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." Tr. 20.

In discrediting plaintiff's testimony, the ALJ cited heavily to objective medical evidence in the record.  "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see* 20 C.F.R. § 416.929(c)(2) ("we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements").  However, "[a]n ALJ does not provide specific, clear, and convincing reasons for rejecting a claimant's testimony by simply reciting the medical evidence in support of his or her residual functional capacity determination. " *Brown-Hunter v. Colvin*, 806 F. 3d 487, 489 (9th Cir. 2015).  Instead, "the ALJ must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001); *see also Orteza*, 50 F.3d at 750 (holding the reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discount the claimant's testimony.").

Here, the record reflects that plaintiff was working as a drive-up bank teller on September 4, 2012, when she tripped and fell while she was trying to retrieve a customer's check that had blown away.  Tr. 295, 689, 691.  Plaintiff had suffered from "chronic neck and headache her whole life,"[2] but the fall caused a "significant pain increase."  Tr. 477.  An MRI showed "rotator cuff tendinosis with partial-thickness bursal surface tear" and "[d]egenerative changes of the acromioclavicular joint."  Tr. 400.  A radiologic exam showed "mild anterolisthesis of C4 on C5 which may be degenerative in nature," and "disc space narrowing C4-C5, C5-C6, and C6-C7 with marginal osteophytes."  Tr. 401.

Plaintiff complained of constant shoulder pain and was prescribed tramadol.  Tr. 691.  At some point, plaintiff received a subacromial injection, but it did not result in improvement.  Tr. 691.  Additionally, she tried physical therapy, but also without improvement.  Tr. 691.  Plaintiff received another injection in the left shoulder subacromial space in December 2012.  Tr. 691.  At that time, she was released to work with the restriction of "[n]o use of the left arm."  Tr. 701.

In January 2013, plaintiff sought treatment from Dr. Jeffrey Bert, an orthopedist.  She complained of "severe pain," Tr. 295, and appeared to be in "acute discomfort."  Tr. 296.  Plaintiff  had a "lot of spasm" in her neck, had trouble moving her head and neck, had radiating pain down her left arm with numbness in her hand, and had limited range of motion.  Tr. 295.  She reported that she had been prescribed hydrocodone, but was "not getting a lot of relief."  Tr. 296.  A review of plaintiff's cervical spine showed a moderately bulging degenerative disc at C6-7.  Tr. 296.  An MRI of her shoulder revealed no major rotator cuff tear.  Tr. 296.  Dr. Bert opined that "vigorous and aggressive therapy" was warranted.  Tr. 296, 300.  After several

---

[2] Plaintiff was in a car accident when she was 15 years old.  Tr. 38.  She described "that's when my neck first started bothering me."  *Id.*  She also testified that she "had headaches all my life."  Tr. 37.

months, however, plaintiff's shoulder still felt "absolutely miserable," Tr. 298, due to "the

ravages of an aggravation of degenerative disc at 6-7 and red hot impingement syndrome," as Dr.

Bert described it.  Tr. 301.  Therefore, on November 21, 2013 (plaintiff's alleged onset date), Dr.

Bert performed surgery for impingement syndrome on plaintiff's left shoulder.  Tr. 304.

      After surgery, plaintiff engaged in physical therapy, Tr. 308; however, chart notes from

May 2014 indicate that she was "not faring well on therapy at all," she "still has marked pain in

her left shoulder," and "[s]he does not seem to be improving."  Tr. 313.  Dr. Bert indicated:

> This is disturbing. She should be much further along at this paint. She is showing
> a lot of pain behavior. I am going to repeat a left shoulder MRI to give the benefit
> of the doubt before considering any further treatment. We will stop the formal
> therapy. I do not see with this level of pain that she is employable at this point in
> time.

Tr. 314; *see also* Tr. 308 (January 2014: "I do not think she can work, and they are not offering

her light duty."); Tr. 311 (March 2014: "I feel she is capable of light duty work.").

      An MRI of plaintiff's shoulder was conducted in September 2014.  Tr. 316.  Results

showed the rotator cuff appeared intact and "[n]o discrete rotator cuff tear is seen."  Tr. 316.

There was a "lineal increased signal suggesting minimal tearing versus vascularity involving the

posterior labrum."  Tr. 316.  The AC joint also showed mild degenerative changes.  Tr. 316.

      In November 2014, plaintiff followed up with Dr. Bert who indicated, "[t]o me[,] her left

shoulder MRI is unremarkable," although he observed that plaintiff had a "great deal of pain

with this left shoulder," it was "touch tender," and "[a]ny attempt to move causes her severe

discomfort."  Tr. 319.  Dr. Bert opined, "This is almost a regional pain syndrome type of

condition."  Tr. 319.

      Dr. Bert ordered an MRI of plaintiff's cervical spine, which was conducted in December

2014.  Tr. 321.  It showed "[m]ild to moderate multilevel discogenic and facet degenerative

spondylosis . . . most notably involving C3-C4, C4-C5, and C5-C6." Tr. 322. In January 2015, plaintiff reviewed this MRI with Dr. Bert, who observed plaintiff had "mildly moderate degenerative changes at 5-6 and 6-7, but again today she will not move her shoulder." Tr. 324. Dr. Bert noted, "Based on her MRI, I believe she should have some physical therapy and get a second opinion." Tr. 324.

Plaintiff saw Dr. Bert again in April 2015 when he noted she "is still complaining of inability to move her arm and to get away from unremitting neck pain. She is showing a great deal of pain behavior." Tr. 325. However, he was "at a loss to explain why she cannot move her arm any further than she is." Tr. 325. He noted that plaintiff "really needs to be seen by a pain management doctor." Tr. 326. He referred her to a neurosurgeon for her neck, and recommended physical therapy for her arm. Tr. 326.

When plaintiff saw Dr. Bert in August 2015, he wrote that she continued to do physical therapy and "has gotten a little better in terms of neck range of motion." Tr. 328. Although plaintiff "still will not move her shoulder," Dr. Bert opined "[i]t is not truly a frozen shoulder as I can passively take it through a range of motion." Tr. 329. Thereafter, plaintiff followed up with Dr. Bert in September 2015, when he noted "she will not move" her shoulder, she had "global pain about the shoulder," and her shoulder was "touch tender." Tr. 331. He further stated, "I am at a loss to explain this. This may be regional pain syndrome." Tr. 331.

Plaintiff did not see Dr. Bert any further, but instead sought treatment for pain management. At a medical appointment in October 2016, plaintiff "guard[ed] her left shoulder" and described pain that was "burning, aching," and like a "stabbing ice pick." Tr. 477. She continued to do "home exercise 15min/day (neck rom and pendulum)." Tr. 477. She also continued taking tramadol, which had been prescribed since at least 2013, Tr. 295, and was

providing some relief, reducing the pain from 10 to 7.  Tr. 352; *see also* Tr. 477 (reporting that tramadol brought pain down to 3/5).  Plaintiff was referred to a program called Train Your Brain. Tr. 358.  Chart notes indicate plaintiff "does not believe she could sit through a chronic pain related class . . . as her pain would not allow."  Tr. 343.  Other chart notes indicate plaintiff was "willing to try train your brain classes."  Tr. 464; *see also* Tr. 488 ("willing to try" Train Your Brain class).

Another MRI was conducted on plaintiff's left shoulder in April 2017.  Tr. 582.  Results showed "several small partial-thickness tears of the supraspinatus infraspinatus tendons likely," "[i]rregularity of the superior labrum in the representative of a tear of unknown age or etiology," "[m]oderate chondromalacia with cartilage thinning and irregularity," and "[s]mall subchondral bony changes."  Tr. 583.  Also, there was a "[f]aint central high T2 signal of the long biceps tendon [that] may represent a longitudinal tear or tendinopathy."  *Id.*

In May 2017, plaintiff saw another orthopedist, Dr. Wesley Johnson, who noted that x-rays of plaintiff's shoulders were within normal limits.  Tr. 597.  Regarding plaintiff's April 2017 MRI, Dr. Johnson observed it "reveals near bone-on-bone changes in the posterior aspect of the glenoid consistent with advanced severe arthritis."  Tr. 597.  The rotator cuff appeared to be intact.  *Id.*  The MRI otherwise "suggested some partial thickness cuff tearing but no other specific abnormalities other than what might be some early glenohumeral arthritis as well as some labral abnormalities."  Tr. 595.  Dr. Johnson found the MRI was "not terribly compelling other than for what I think is a significant amount of damage to the posterior surfaces of the glenoid," which needed to be "elucidated with a CT scan."  Tr. 597.  He further observed the Dr. Bert had removed some bone in the anterior joint and it needed to be determined whether there was any fracture of the acromion, which was "exquisitely tender."  Tr. 597.  Dr. Johnson opined

it "may also be that [plaintiff] has some type of complex regional pain syndrome which could act like this." Tr. 597. He concluded it was "a very difficult case," and directed plaintiff to return after a CT scan was performed. Tr. 597.

A CT scan was conducted on May 30, 2017, and showed only mild osteoarthritis with irregularity of the glenoid surface and trace osteophytosis of the medial humeral head, minimal enthesopathy at the distal inferior clavicle at the coracoclavular joint, no suspicious lytic or sclerotic lesions, and minimal a.c. hypertrophy. Tr. 623, 636. Plaintiff discussed the results of the CT scan with Dr. Johnson in June 2017. Tr. 637. Dr. Johnson's chart notes confirm the CT scan revealed no fractures or "any real significant arthritis." Tr. 637. Dr. Johnson observed that plaintiff's behavior during the exam—i.e., keeping her hand in a clutched posture and "any attempt to touch the skin around her shoulder or upper brachium results in some degree of dysesthesia or pain"—was "quite consistent" with regional pain syndrome. Tr. 637; Tr. 638 (noting plaintiff's "significant dysesthesias and hyperesthesia over the shoulder and her characteristic cradling of the upper extremity and somewhat contracted hand would suggest characteristics best thought relatable to RSD"); *id.* ("Impression: Probable RSD or CRPS," i.e., Complex Regional Pain Syndrome). Plaintiff complained that her "pain has been present since immediately after her operation and really hasn't changed much at all." Tr. 707. Dr. Johnson concluded that the "best option for understanding her problem rests on the neurologic source of her symptom." Tr. 638. Otherwise stated, he found the "lack of objective findings to my exam suggest a neurologic source" and recommended that plaintiff follow up with a neurologist. Tr. 638.

Plaintiff continued to receive treatment for "chronic shoulder pain" throughout 2017. She described the pain as constant, jabbing, burning, and like an ice pick. Tr. 648, 652. It was

triggered from sitting at a computer, driving, and lifting anything with her left arm.  Tr. 648.  She

described it was difficult to lift up her arm, wash dishes, and walk her dog.  Tr. 649.  Chart notes

reflect that plaintiff had completed physical therapy twice and "was told there was nothing they

could do."  Tr. 649, 656.  Plaintiff was diagnosed with cervical disc disease, impingement

syndrome of left shoulder, and chronic pain syndrome, and prescribed hydrocodone.  Tr. 651,

654, 658, 673.

Records show that in June 2017, plaintiff met with Dr. Wei who diagnosed "possible

RSD or CRPS to left shoulder/arm."  Tr. 649, 656, 659.  Also, plaintiff scheduled an

appointment with a neurologist, Dr. Anton Lotman, for December 12, 2017, to "rule out chronic

regional pain syndrome, although the record appears to be silent as to whether that appointment

occurred.  Tr. 331, 652.  A chart note indicates that plaintiff was "currently uninsured, and states

she may not be able to keep appt w/neurology."  Tr. 659; Tr. 663 (indicating she had just lost

insurance through Oregon Health Plan); Tr. 668 (indicating she was "somewhat limited for

specialty care due to finances").

In January 2018, plaintiff continued to complain of ongoing daily pain, and it was noted

"[l]ocal ortho and PT have no more to offer her."  Tr. 668.  Medical professionals "continue[d] to

manage her pain with pain med every three months to help alleviate more financial burden."  Tr.

668.

Plaintiff suffered another fall in September 2018 and was seen in the emergency room for

pain to her right shoulder and neck.  Tr. 710-21.  Plaintiff had a CT scan and x-rays, which

showed no fracture.  Tr. 721.

In December 2018, plaintiff presented for a follow up for shoulder pain, and rated her left

shoulder pain 7/10.  Tr. 726.  In addition to pain, she exhibited decreased range of motion and

tenderness. Tr. 728. Plaintiff did report that her "left shoulder is finally starting to feel a little bit better as long as she doesn't 'overdo it.'" Tr. 726. "[W]hen she uses it too much she has increased pain so she has been trying to 'baby it' as much as possible." Tr. 726. Medical staff cautioned plaintiff not to "baby it too much as this will actually cause more pain issues." Tr. 726. Physical therapy was encouraged but declined due to cost. Tr. 726. Plaintiff was encouraged to continue stretching and resuming Gabapentin and Methacarbamol. Tr. 726. She was also prescribed Tylenol with codeine for pain. Tr. 727.

The ALJ discounted plaintiff's subjective symptom testimony because the medical record, particularly test results, did not support the severity of plaintiff's symptoms. Tr. 20 (citing plaintiff's MRIs, "imaging studies," and CT scan). Indeed, as outlined at length above, x-ray results were normal (Tr. 597), and MRI and CT scan results showed only mild to moderate degenerative changes in the cervical spine (Tr. 296, 316, 322), and mild osteoarthritis (Tr. 623). There was evidence of subtle tearing in the posterior labrum (Tr. 316, 562), but the rotator cuff was intact (Tr. 296, 316, 597).

However, "once the claimant produces objective medical evidence of an underlying impairment, an adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain." *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991); *Rollins*, 261 F.3d at 857. As the Ninth Circuit has explained, "pain is a completely subjective phenomenon" and "cannot be objectively verified or measured." *Id.* at 347.

Here, the ALJ also cited to plaintiff's conservative treatment as a basis to discount her subjective testimony. The ALJ observed that "[b]y way of treatment, the claimant has tried multiple treatment modalities including physical therapy, a shoulder sling, muscle relaxers, anti-

inflammatories, injections, Toradol, Phenergan, and nerve relaxers, as well as over-the-counter and prescription pain medication." Tr. 21. The ALJ concluded that, "[o]verall, the claimant's treatment has been conservative, largely over-the-counter and prescription medication. She has not generally received the type of medical treatment one would expect for a totally disabled individual." Tr. 21-22.

However, for years, plaintiff was prescribed tramadol, hydrocodone, and codeine, all of which are opioids.[3] "[P]ain treatment with opioid analgesics generally is not considered conservative." *O'Connor v. Berryhill*, 355 F. Supp. 3d 972, 985 (W.D. Wash. 2019). Also, "[m]any courts consider the use of narcotics and injections for pain management not conservative in nature." *Childers v. Berryhill*, No. 318CV00170RCJCBC, 2019 WL 1474030, at *9 (D. Nev. Mar. 12, 2019), *report and recommendation adopted,* No. 318CV00170RCJCBC, 2019 WL 1473367 (D. Nev. Apr. 3, 2019) (collecting cases and citing *Garrison*, 759 F.3d at 1015 n.20 ("[W]e doubt that steroid shots to the neck and lower back qualify as 'conservative treatment.'").

Moreover, plaintiff argues that she "has had more than conservative treatment, especially since further surgery was not recommended." Reply 8. On that point, the language from the Ninth Circuit's unpublished decision in *Lapeirre-Gutt v. Astrue*, is instructive:

> Even assuming Lapeirre–Gutt's regimen of powerful pain medications and injections can constitute "conservative treatment," *compare Carmickle v. Comm'r,* 533 F.3d 1155, 1162 (9th Cir. 2008) (ALJ found claimant's treatment to be conservative where claimant took only Ibuprofen to treat his pain), it is untrue that Lapeirre–Gutt's treatment has been so limited. Lapeirre–Gutt underwent cervical fusion surgery in May 2004 in an attempt to relieve her pain symptoms. While Lapeirre–Gutt has not undergone any surgery since that time, the record does not reflect that more aggressive treatment options are appropriate or

---

[3] Plaintiff was no longer taking narcotic pain medication at the time of the hearing. Tr. 39. She explained, "They won't prescribe it to me anymore," because the dosage was too low for her pain and she took too many before her prescription expired. Tr. 39.

available. A claimant cannot be discredited for failing to pursue non-conservative treatment options where none exist.

382 F. App'x 662, 664 (9th Cir. 2010).

The ALJ also rejected the severity of plaintiff's subjective complaints because her "alleged limitations are not fully supported by [her] reported activities." Tr. 22. Specifically, the ALJ observed that plaintiff is "able to perform adequate selfcare, care for her pets, do household chores, including vacuuming and dishes, and visit with friends," which "indicate a higher level of function than that alleged by the claimant." Tr. 22.

An ALJ may invoke activities of daily living in the context of discrediting subjective symptom testimony to (1) illustrate a contradiction in previous testimony or (2) demonstrate that the activities meet the threshold for transferable work skills. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). Here, it appears the ALJ cited plaintiff's activities to illustrate a contradiction; however, plaintiff's activities did not contradict her claimed limitations. Regarding housework, plaintiff testified that her husband "does most of it," Tr. 41, and when she vacuums, she uses only one hand to operate a lighter, cordless vacuum. Tr. 41. Plaintiff also described that she must do many things such as washing dishes, preparing meals, bathing, and caring for her hair "one handed." Tr. 235-26. She claimed she is unable to cut up food, shave, or use a computer at all. Tr. 235, 237. As for pets, plaintiff described that her husband cared for them. Tr. 234. And even if plaintiff did feed them, it is fair to say that feeding pets can be a one-handed job.

For these reasons, the ALJ failed to provide clear and convincing reasons, supported by substantial evidence, to discount plaintiff's subjective symptom testimony. When a court determines the Commissioner erred in some respect in making a decision to deny benefits, the court may affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for a rehearing." *Treichler*, 775 F.3d at 1099 (quoting 42 U.S.C. § 405(g)). In

determining whether to remand for further proceedings or immediate payment of benefits, the Ninth Circuit employs the "credit-as-true" standard when the following requisites are met: (1) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, (2) the record has been fully developed and further proceedings would serve no useful purpose, and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the plaintiff disabled on remand. *Garrison*, 759 F.3d at 1020. Even if all of the requisites are met, however, the court may still remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled[.]" *Id*. at 1021.

Here, the first requisite of the *Garrison* test is met in that the ALJ erred in rejecting plaintiff's subjective symptom testimony. However, it cannot be said that further proceedings would serve no useful purpose. Therefore, remand rather than immediate award of benefits is appropriate.

Plaintiff also argues the ALJ erred when she "did not mention the important testimony that the problem [plaintiff] has using her left upper extremity is she can't lift it and reaching in front of her body on the left side is difficult." Tr. 5; *see also* Reply 4 (arguing the ALJ "did not adequately address and discount Plaintiff's testimony of specific limitation in that reaching in front her body on the left side was difficult"). Plaintiff contends that this omission is important because the "Vocational Expert expressly and specifically testified that an individual who could only occasionally reach forward with the nondominant left upper extremity couldn't do the identified jobs of Inserting Machine Operator; Collator Operator; and Photocopy Machine Operator; or any other jobs except the job of Usher; and after further questioning regarding the requirements of the Usher job, the ALJ declined to use it as a job Plaintiff could do." Reply 4 n.1 (citing Tr. 46-49); *see* Tr. 23-25.

At the hearing, plaintiff testified that she could not drive or use the computer because it involved reaching in front of her body. Tr. 37. It appears the ALJ attempted to account for plaintiff's inability to reach in front of her by including a restriction that plaintiff could not drive or use a computer. Tr. 19. The ALJ also included in the RFC that plaintiff can lift and carry only with the dominant right upper extremity and cannot reach overhead with her left upper extremity. Tr. 19. Nevertheless, it is unnecessary to discuss this issue further because the ALJ will have the opportunity to make any clarifications on remand.[4]

## ORDER

The Commissioner's decision is REVERSED and REMANDED for further proceedings consistent with this opinion.

DATED June 2, 2022.

/s/ Youlee Yim You
Youlee Yim You
United States Magistrate Judge

---

[4] Plaintiff makes an "alternative" argument that the ALJ erred in failing to find she suffered from CRPS at step two. Pl. Br. 14. The ALJ concluded that "[a]lthough the record mentioned *probable* Complex Regional Pain Syndrome (CRPS), the record does not definitively contain the requisite criteria established under Social Security Ruling (SSR) 03-02p." Tr. 16 (emphasis in original); *see* Tr. 656 (Dr. Wei) (indicating "possible" diagnosis of CRPS). Given, plaintiff has prevailed on her primary argument, it is unnecessary to reach this "alternative" argument.